# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

In the Matter of the Search of: )
)
Information Associated with a Particular Geographic ) Case No. 22-m-750
Area, Stored at Premises Controlled by Google, Inc. )
)
)
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A.

over which the Court has jurisdiction pursuant to Title 18, United States Code, Sections 2703 and 2711, there is now concealed:

See Attachment B.

The basis for the search under Fed. R. Crim P. 41(c) is:
☒ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: 18 U.S.C. § 1111 and 1153(a)

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Applicant's signature

SA Brian D'Arcy, Federal Bureau of Investigation
Printed Name and Title

Sworn to before me and signed in my presence:

Date: 12/29/2022

_____
Judge's signature

City and State: Green Bay, Wisconsin       Hon. James R. Sickel, U.S. Magistrate Judge
                                           Printed Name and Title

# ATTACHMENT A

## Property To Be Searched

This warrant applies to information associated with the Google accounts located within the geographical region to the southwest of an intersection between a portion of County Trunk Highway VV West and Max Martin Road, Keshena, Wisconsin, and bounded by the following latitudinal and longitudinal coordinates between February 11, 2022 at 1:30pm CST and February 13, 2022 at 1:30pm CST, that is stored at premises controlled by Google, a company that accepts service of legal process at 1600 Amphitheatre Parkway, Mountain View, California 94043:



A: N44.876593, W88.678950
B: N44.857309, W88.673714
C: N44.857492, W88.712724
D: N44.870328, W88.712724

# ATTACHMENT B

## Items To Be Seized And Searched

**Information to be disclosed by Google**

Google shall provide responsive data (as described in Attachment A) pursuant to the following process:

1. Google shall query location history data based on the Initial Search Parameters (as described in Attachment A).

2. For each location point recorded within the Initial Search Parameters, Google shall produce anonymized information specifying the corresponding unique device ID, timestamp, coordinates, display radius, and data source, if available (the "Anonymized List").

3. Law enforcement shall review the Anonymized List to remove devices that are not relevant to the investigation, for example, devices that were not in the location for a sufficient period of time. If additional location information for a given device ID is needed in order to determine whether that device is relevant to the investigation, law enforcement may request that Google provide additional location coordinates for the Time Period that fall outside of the Target Location. These contextual location coordinates may assist law enforcement in identifying devices that were located outside the Target Location, were not within the Target Location for a long enough period of time, were moving through the Target Location in a manner inconsistent with the facts of the underlying case, or otherwise are not relevant to the investigation.

4. For those device IDs identified as relevant pursuant to the process described above, law enforcement may request that Google Provide identifying information, as defined in 18 U.S.C. § 2703(c)(2), for the Google Account associated with each identified device ID.

# AFFIDAVIT IN SUPPORT OF
# AN APPLICATION FOR A SEARCH WARRANT

I, Brian D'Arcy, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been employed as such since July 2017. Upon graduation from the FBI Academy in Quantico, Virginia, I was assigned to the Milwaukee Division, Green Bay Resident Agency. Since arriving in Green Bay, I have been assigned to work on various criminal violations, to include fraud, child pornography, armed robberies, drug trafficking, and crimes occurring on Native American reservations. I have experience in conducting criminal investigations involving suspects using electronic communications to orchestrate criminal activity. I have assisted in the execution of search warrants for the purpose of obtaining documents relating to various criminal activity. As a Special Agent of the FBI, I am authorized to investigate violations of the criminal laws of the United States, and am a law enforcement officer with the authority to execute warrants issued under the authority of the United States.

2. I make this affidavit in support of an application for a search warrant for information that is stored at premises controlled by Google, an email provider headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require Google to disclose to the government copies of the information further described in Attachment B.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement officers and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on the facts set forth in this affidavit, I submit there is probable cause to search the information described in Attachment A for evidence of a violation of Title 18, United States Code, Sections 1111 and 1153(a).

## JURISDICTION

5. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## BACKGROUND RELATING TO GOOGLE AND RELEVANT TECHNOLOGY

6. A cellular telephone or mobile telephone is a handheld wireless device used primarily for voice communication through radio signals. Cellular telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other cellular telephones or traditional "landline" telephones. Cellular telephones rely on cellular towers, the location of which may provide information on the location of the subject telephone. Cellular telephones may also include global positioning system ("GPS") technology for determining the location of the device.

7. Google is an Internet company that, among other things, provides electronic communication services to subscribers. Google allows subscribers to obtain email accounts at the domain name gmail.com. Subscribers obtain an account by registering with Google. During the registration process, Google asks subscribers to provide basic personal information. Therefore, the computers of Google are likely to contain stored electronic communications (including retrieved and unretrieved email for Google subscribers) and information concerning subscribers and their use of Google services, such as account access information, email transaction information, and

2

account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

8. In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and my experience, I know that even if subscribers insert false information to conceal their identity, I know that this information often provide clues to their identity, location or illicit activities.

9. In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of login (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

3

10. As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account. Further, information maintained by the email provider can show how, where, and when the account was accessed or used. Based on my training and experience, I have learned that Google also maintains records that may reveal other Google accounts accessed from the same electronic device, such as the same computer or mobile device, including accounts that are linked by Hypertext Transfer Protocol (HTTP) cookies, which are small pieces of data sent from a website and stored in a user's Internet browser.

11. Google has developed an operating system for mobile devices, including cellular phones, known as Android. Nearly every cellular phone using the Android operating system has an associated Google account and users are prompted to add a Google account when they first turn on a new Android device.

12. Based on my training and experience, I have learned that Google collects and retains location data from Android-enabled mobile devices when a Google account user has enabled Google location services. The company uses this information for location-based advertising and location-based search results. This information is derived from GPS data, cell site/cell tower information, and Wi-Fi access points.

13. Location data can assist investigators in understanding the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic

location of the account user at a particular time (e.g., location information integrated into an image or video sent via email).

## PROBABLE CAUSE
*Check Fraud*

14. On February 11, 2022, at approximately 1:30 PM, Shawano Police Department (SPD) Detective Daniel Conradt assisted SPD Officer Hoffman with a complaint at the Shawano Pawn Shop involving suspects allegedly involved in the cashing of fraudulent checks. The suspect vehicle was a maroon Jeep Cherokee with license plate number ALU1259 and the suspect driver was Justin Dickenson. Detective Conradt later received information from Stockbridge-Munsee Tribal Police Department (SMTPD) Lieutenant Mary Creapeau, advising that the passengers in Justin Dickenson's vehicle during this time were James Lyons Jr. and Abby Niven. As Detective Conradt was traveling north on North Main Street passing Alpine Drive in Shawano, he observed the maroon Jeep exit the pawn shop lot and turn south onto North Main Street. As the Jeep passed Detective Conradt, he observed a male driver who he believed to be Justin Dickenson. He also observed another person in the front passenger seat of the vehicle and an additional person in the rear passenger seat. After Officer Hoffman activated her overhead emergency lights, the suspect vehicle did not stop. The Jeep continued west out of the City of Shawano on County Highway MMM, turning north onto Poplar Road and then west onto Oak Avenue. Detective Conradt had dispatch run Justin Dickenson and he was advised that Dickenson had active warrants for his arrest, including battery. As Detective Conradt passed W7950 Oak Avenue in Shawano he was advised to terminate the pursuit. He last saw the Jeep heading into Thornton, Wisconsin.

15. Detective Conradt contacted Scott Backes with the Shawano Pawn Shop, who said that the suspects were attempting to sell/pawn items at the shop that day, however the transaction was not completed. Detective Conradt also spoke to Brenda Kohel, the owner of the Jeep

5

Cherokee. Detective Conradt advised Kohel that the vehicle was involved in a chase and asked who had possession of the Jeep. Kohel said that her son, Justin Dickenson, had the Jeep and was with two other people she did not know.

*Missing Person Report*

16. On February 26, 2022, Stockbridge-Munsee Tribal Police Department Officer Tyler Schech responded to a report of a missing person at N7588 Ah Toh Wuk Road, Township of Bartelme, WI 54416. The complainant, Brenda L. Kohel, and witness, Tiana B. Webster, reported that Justin Dickenson was missing and was last seen on February 11, 2022. Brenda Kohel is the mother of Justin Dickenson. Kohel and Webster told officer Schech that Dickenson was last seen on February 11, 2022, when he stole his mother's 2016 red Jeep Cherokee with Wisconsin license plate number ALU1259. Dickenson got into a pursuit with the Shawano Police and Dickenson used the App Messenger to send a text to Webster. Dickenson said that he was in a police chase and that the Jeep was stuck in the woods. Dickenson wanted Webster to contact his ex, Jessica, and ask her to pick him up. Webster said that she asked Dickenson to contact other people to let them know that he was okay. As of February 26, 2022, Dickenson had not opened the message.

17. Kohel told Officer Schech that she had spoken with Charles Terrio on February 26, 2022, who told her that Dickenson was with someone by the name of Baby Dude Lyons and that Kohel's Jeep was stuck in the woods. Terrio said that he had not personally seen Dickenson. Following this conversation, Kohel and Webster decided to contact law enforcement.

18. Kohel and Webster also advised Officer Schech that Dickenson may have been suicidal and had made concerning statements in the past, such as not wanting to be here anymore or being unable to live like this anymore. Additionally, in the Summer of 2021, Dickenson's ex lost custody of their children and in December 2021, Dickenson was made homeless after his ex

6

refused to let him stay with her after she completed drug treatment. Kohel and Webster said that Dickenson was not an alcoholic, but used methamphetamine, marijuana, and heroin. Dickenson was last seen wearing a grey hoodie and jeans.

19. Following the initial report from Dickenson's mother, Stockbridge-Munsee Tribal Police Department (SMTPD) officers followed up on a number of alleged sightings of Dickenson around the Shawano area by obtaining security camera footage. Based on a review of security camera footage, none of the alleged sightings appeared to depict Dickenson or officers were unable to confirm the identity of the individual. Additionally, investigators have followed up on numerous tips and leads submitted by the public.

20. On April 7, 2022, SMTPD Lieutenant Mary Creapeau spoke with James Lyons Jr. via telephone. Lt. Creapeau informed Lyons that she knew he was in the vehicle with Dickenson during the pursuit with the Shawano Police Department on February 11, 2022. Lyons said that they drove to the Menominee Reservation by Max Martin Road. Dickenson was driving very fast and was unable to make the turn onto Max Martin Road from Box Elder Road. They drove straight onto a logging road far enough to where no one could see it, about a ten-minute walk. Lyons said that they both exited the vehicle and Dickenson walked toward the Menominee side and he (Lyons) stayed on the trail and walked back out to the road toward Gresham. He then went to a farmer's house and they gave him a ride to Gresham.

21. On April 8, 2022, the vehicle Dickenson was last seen driving was located near the Shawano County and Menominee Indian Reservation line, in the area of Max Martin Road, on the Menominee Indian Reservation. When the vehicle was found by law enforcement, the battery was missing. On April 26, 2022, the vehicle was searched by investigators, but nothing of evidentiary value was located. The owner of the car, Brenda Kohel, provided consent to search the vehicle.

### Interview of Mary Perez

22. On May 18, 2022, SMTPD Lieutenant Mary Creapeau spoke with Mary Perez. Perez told Lieutenant Creapeau that the night before Dickenson went missing, he was doing drugs and talking about how sad he was because he had not seen his kids. Perez admitted that on the following day, February 11, 2022, she was in the vehicle when the police chase was initiated in Shawano. Perez was with Dickenson, Abby Niven, and James Lyons Jr. As the police chase was happening, Dickenson was smoking heroin. Dickenson also wanted to call his mother and Perez said that she called Dickenson's mother using his phone. Dickenson spoke with his mother, but Perez did not recall the details of the conversation. Perez said that they went down a logging road on the Menominee Reservation and stopped the vehicle. She, Niven, and Lyons got out of the vehicle and walked through the woods and Dickenson walked the other way. Perez said that they walked to a house on Max Martin Road and the occupants gave them a ride back to a residence in Gresham, Wisconsin. When asked why Dickenson went one way and they all went another way, Perez said that she did not know and that Dickenson was flipping out. When asked what she thought happened to Dickenson, Perez said that she heard that Dickenson overdosed, but did not say where it would have happened or who mentioned it.

### Interview of Abby Niven

23. On May 25, 2022, investigators spoke with Abby Niven at the Shawano County Sheriff's Office. After being advised of her Miranda rights and agreeing to speak with investigators, Niven stated that on Friday night on February 10th or 11th, Justin Dickenson came over to her house because an individual by the name of Tiffany had been arrested for some type of check "thing." Dickenson came in with some checks and told them not to touch the checks. Niven and her boyfriend, James Lyons Jr., offered Dickenson a place to stay because he had nowhere to go. Dickenson stayed through the night. The following morning, Dickenson was in tears because

8

his child's mother had left him. Niven described Dickenson as sobbing. Dickenson also asked Niven if she could find him pure Fentanyl.

24. The same morning, Niven, Lyons, Dickenson, and Mary Perez drove into Shawano. While at the Family Dollar store, a girl came to the car that Niven did not know. Niven said that Dickenson had methamphetamine, which he may have exchanged for "down" with the female, but she was not sure. Through my training and experience, I am aware that the term "down" frequently refers to heroin. They then traveled to the casino in Keshena, where Dickenson and Perez left Niven and Lyons for a couple of hours. After this, the group went to the Shawano pawn shop to pawn an item. Following this, Niven recalled riding in the car and hearing Dickenson say, "Oh, shit," because a police officer had turned around. Dickenson, who was driving the vehicle, started throwing things out of Lyon's front passenger window, which Niven believed may have been drug paraphernalia. Dickenson also used heroin while being pursued by law enforcement. Lyons took the wheel for Dickenson, who said that he was not going to jail sober. Niven surmised that Dickenson may have obtained the heroin when she and Lyons were at the casino. Dickenson also tried to have Niven call his mother using "Star 67" (*67). Niven was unable to, so someone else in the vehicle did, possibly Mary Perez. During his conversation with his mother over the phone, Dickenson told his mother that he did not want to go to jail and that he was sorry.

25. During the chase, Niven described the police as all of a sudden being gone. Dickenson drove onto a snowy road, where they stopped and got out. When they exited the vehicle, Dickenson hit the alarm on accident. Niven, Lyons, and Perez walked in front of the car and headed that direction. Dickenson walked in the opposite direction. The vehicle was stopped in the woods. When Dickenson walked in the opposite direction, there was no conversation or argument about where he was going. Dickenson took a cigarette before he left and locked the door to the car. Niven believed that Dickenson may have walked in the other direction because he and Perez had obtained

9

heroin and he did not want to share it with Perez. Niven learned from Perez at a later date that Dickenson was supposed to give some of the heroin to Perez.

26. After walking away from the car, Lyons heard a chain saw, which he thought was law enforcement on snow mobiles. Niven followed Lyons down a path of trees and a long field, where they saw two people outside. Lyons told the people that they had been in a chase with the police. Niven believed it was around 2:00 or 3:00 PM in the afternoon at this time.

*Interview of James Lyons Jr.*

27. On May 25, 2022, investigators spoke with James Lyons Jr. at the Shawano County Sheriff's Office. After being advised of his Miranda rights and agreeing to speak with investigators, Lyons stated that on February 10, 2022, Justin Dickenson drove to Lyons' home in Gresham, Wisconsin. Dickenson said that he was out of gas and could not get to Shawano. Dickenson stayed at Lyons' home that night, where he ate and showered. The following morning, Lyons had Dickenson drive him to Shawano to a consignment shop where he hoped to purchase a pair of shoes. Dickenson drove Lyons, Abby Niven, the girlfriend of Lyons, and Mary Perez to Shawano. Following this, the group drove to the Menominee Tribal Casino where Lyons could gamble.

28. Dickenson wanted to go back to Shawano after leaving the casino and Lyons had an item that he wanted to pawn at the pawn shop. After they left the pawn shop, Lyons saw a police car stop and turn around. The police squad car turned on its lights to stop their vehicle and Dickenson did not stop. Dickenson told Lyons that he wanted to get high before going to jail. Dickenson began smoking heroin from tinfoil while driving. Dickenson then asked for someone in the car to call his mom for him and spoke to his mother over the phone. Dickenson drove past 21st Century Genetics, at which point law enforcement was no longer pursuing them, but Dickenson hit the gas and began driving recklessly towards Max Martin Road on the Menominee

Indian Reservation. Dickenson was driving too fast to make the turn and drove straight off, before taking a right and coming to a stop. They all exited the vehicle and Lyons, Niven, and Perez began walking down the road and turning right where they found a farmhouse next to a field. Dickenson walked down the road in the opposite direction, back in the direction they drove in from. This was the last time that Lyons saw Dickenson.

29. At the farmhouse, Lyons asked the owner of the home, later identified as Daniel Tomow, to drive him, Niven, and Perez back to Gresham in exchange for $10. Once home, Lyons went to sleep. At approximately 1:30 AM, Lyons messaged Dickenson, "WTF" (what the fuck). To Lyon's knowledge, Dickenson never read the message.

*Interview of Daniel Tomow*

30. On June 1, 2022, investigators spoke with Daniel Tomow, the owner of the farmhouse on Max Martin Road. Tomow said that in February 2022, three individuals arrived at his home and knocked on his door. Tomow answered the door and recognized one of the three individuals as Mary Perez. Tomow was unfamiliar with the other two people and could not recall their names. The three individuals appeared to be high while talking with Tomow. The group stated that they were in a high-speed chase with law enforcement and that their vehicle was stuck on a logging trail behind Tomow's home. The group said that the driver of the vehicle walked in the opposite direction from them. Tomow said that the group stated nothing further about the whereabouts of the driver, nor about his physical or mental condition when they departed from him. Tomow was offered $10 to drive the group to a home near the pawn shop in Gresham. Tomow drove the group to the residence and left. He said that he had not seen any of the individuals or been contacted by them since that day.

11

*Facebook*

31. On July 12, 2022, Shawano Police Department Detective Daniel Conradt received records from Facebook (Meta Platforms, Inc.) pursuant to a state search warrant seeking any and all records for the Facebook accounts belonging to Justin Dickenson, Abby Niven, and James Lyons Jr. between February 10, 2022 and April 26, 2022. Based on a limited review of the records, I observed that on February 12, 2022, at approximately 1:38 AM, James Lyons Jr. sent a Facebook Messenger message to Dickenson stating, "Wtf," which corroborates his statements to investigators. Additionally, I observed that Dickenson had little to no communication on February 10, 2022 on Facebook Messenger. Additionally, the last login to one of the two Facebook accounts belonging to Dickenson that I reviewed was shown to last be accessed on February 11, 2022 at 11:04 AM CST. These observations lead me to believe Dickenson may have been killed or died while on the Menominee Indian Reservation.

*Cell Phone Location History*

32. On July 5, 2022, Shawano Police Department Detective Daniel Conradt received records from Nsight (Cellcom Communications) pursuant to a state search warrant seeking call detail records and location information for telephone number 715-851-8774, which belonged to Justin Dickenson. Based on a review of these records, investigators observed that Dickenson's last outgoing communication was on February 11, 2022 at 2:05 PM, which was an approximately 19-second voice call to telephone number 715-701-1354, which is believed to belong to Brenda Kohel. The telephone records also show numerous outgoing and incoming communications to and from the phone number belonging to Kohel between approximately 12:00 PM and 5:30 PM on February 11, 2022. Of note, an outgoing phone call lasting approximately 6 minutes and 25 seconds was made to Kohel's telephone number at approximately 1:46 PM on February 11, 2022.

The pursuit with the Shawano Police Department began around 1:30 PM, which may suggest that this was the phone call Dickenson made to his mother during the pursuit.

33. Additionally, investigators observed that between 1:00 PM and 2:00 PM on February 11, 2022, Dickenson's phone geo-located to cell phone towers in Shawano, Keshena, and a location between Gresham and Bowler. Between 2:00 PM and 5:30 PM, Dickenson's phone geo-located to the cell phone tower between Bowler and Gresham and to the tower in Keshena. More specifically, a data transfer that occurred at 2:01 PM on February 11, 2022, geo-located to the cell phone tower between Gresham and Bowler. The last outgoing communication made by Dickenson's phone at 2:05 PM geo-located to the Keshena cell phone tower. Additionally, the last data session for the phone occurred at 3:02 PM and geo-located to the Keshena cell phone tower as well. The Keshena cell phone tower is in the vicinity of the area where the vehicle that Dickenson was driving was found.



13

34. Based on the above-described cell phone records and the lack of cell phone activity following the afternoon of February 11, 2022, I believe that the area where Brenda Kohel's vehicle was located was the last known location of Justin Dickenson prior to his disappearance. Obtaining an order such as that described in this search warrant application to receive the information described in Attachments A and B would assist law enforcement in potentially identifying more detailed geo-location information associated with Dickenson's phone. Additionally, the information obtained through the order would help to identify people who were in the vicinity of the area where Dickenson was last seen. This, in turn, could assist with corroborating or disproving the statements made by Mary Perez, Abby Niven, and James Lyons Jr. The information may also assist investigators in identifying additional suspects or witnesses that are yet unknown.

35. I am aware that Justin Dickenson is a Native American Indian. Federal jurisdiction for an investigation into his disappearance attaches through that status and because the locations described above are within the exterior boundaries of the Menominee Indian Reservation in the Eastern District of Wisconsin.

36. The geographical region bounded by the latitudinal and longitudinal coordinates listed in Attachment A, during the times and dates identified in Attachment A, reflects an area to the south of County Highway VV West and to the west of Max Martin Road. The region was drawn in a manner to minimize inclusion of residences in the area, to avoid collecting information from people who were unassociated with the events described in this affidavit.

37. The information sought from Google, as detailed in Attachment B, will identify which cellular devices were near the area where Justin Dickenson was last seen, which may assist law enforcement in determining the identities of people who may know about his disappearance and may provide more detailed geo-location information associated with Dickenson's phone.

14

## CONCLUSION

38. Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Google who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Dated this _29_ day of December, 2022.

_B M. D'Arcy_ 12/29/22 at 3:07 P.M.
BRIAN D'ARCY
Special Agent
Federal Bureau of Investigation

Sworn to before me this _29_ day of December, 2022.

HON. JAMES R. SICKEL
United States Magistrate Judge
Eastern District of Wisconsin